**Eleanor SHAW, Executor of the Estate of Leslie Shaw, Plaintiff,**

v.

**ROLEX WATCH U.S.A., INC. and Rolex Industries, Inc., Defendants.**

No. 86 Civ. 5244 (WCC).

United States District Court,
S.D. New York.

Oct. 28, 1991.

Soller, Shayne & Horn, New York City (Carl R. Soller, of counsel), for plaintiff.

Kane, Dalsimer, Sullivan, Kurucz, Levy, Eisele and Richard, New York City (David H.T. Kane, Siegrun D. Kane, of counsel), and Gibney, Anthony & Flaherty (Stephen F. Ruffino, William Lee Kinnally, Jr., of counsel), for defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Plaintiff Leslie Shaw commenced this action against defendants Rolex Watch U.S.A., Inc. and Rolex Industries, Inc. (collectively "Rolex") on June 30, 1986, claiming that he suffered injuries resulting from defendants' alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d). On June 5, 1990, Leslie Shaw died. Plaintiff Eleanor Shaw, executor of the Estate of Leslie Shaw, was substituted as plaintiff by Order entered November 2, 1990.

This action is presently before the Court on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(c).[1]

### Background

Plaintiff claims that Rolex Watch U.S.A., Inc. ("Rolex U.S.A."), a corporation organized under the laws of the State of New York, and Montres Rolex, S.A. ("Montres"), a Swiss corporation, are under common ownership and control. He alleges that defendants, through acts of mail and wire fraud, unlawfully conspired to submit to the United States Customs Service ("Customs") documents which fraudulently stated that Rolex U.S.A. was not owned or controlled by Montres, the Swiss owner of the "ROLEX" trademark. Am. Cplt. at ¶¶ 30–33. The allegedly false representations consisted of a statement filed by Rolex with Customs on January 7, 1983 and letters sent to Customs on April 12, 1983 and May 11, 1984. Am. Cplt. at ¶¶ 31–32. The purported aim of this conspiracy was to gain the protection of 19 U.S.C. § 1526(a), which allows the domestic owner of a registered trademark to prevent the unauthorized importation of products bearing that trademark (so-called "gray-market" goods).

To employ Section 1526, the trademark owner must record the trademark with Customs. 19 U.S.C. § 1526(a). Should someone other than the owner of the U.S. mark attempt to import the trademarked goods, Customs may seize the goods and hold them forfeit. 19 U.S.C. § 1526(b). Customs, however, will not apply the restrictions on importation set forth in 19 U.S.C. § 1526 when both the foreign and domestic trademark owners are under common ownership or control. *See* 19 C.F.R. § 133.21(c)(2).

On January 13, 1985, Shaw, by his agents, sought to import eight genuine Rolex watches. Am. Cplt. at ¶ 44. Customs seized the watches, and on August 8, 1985, plaintiff was indicted by a federal grand

---

1. For a review of the prior dispositions in this matter, *see Shaw v. Rolex Watch U.S.A., Inc.,* 745 F.Supp. 982 (S.D.N.Y.1990); *Shaw v. Rolex Watch U.S.A., Inc.,* 726 F.Supp. 969 (S.D.N.Y.1989); *Shaw v. Rolex Watch U.S.A., Inc.,* 673 F.Supp. 674 (S.D.N.Y.1987).

jury for, *inter alia*, smuggling, entry of goods by means of false statement, importing goods contrary to law, and making false statements. Plts. Exh. 7. Subsequent to the indictment, Shaw alleges that he was hospitalized for treatment of Ramsey Hunt Syndrome, a painful nervous disorder. After five months, during which plaintiff allegedly suffered severe emotional and physical distress, the indictment was dismissed. Am. Cplt. at ¶¶ 45–46. On May 23, 1986, Shaw entered into an agreement with Customs in which he obtained release of the eight Rolex watches for exportation in exchange for his waiver of certain rights in connection with the detention, seizure, and/or release by Customs of the watches.[2]

During the years of 1985–86, plaintiff's attorney, Mr. Soller, submitted material to Customs challenging the propriety of the Rolex recordation. Defs. Rule 3(g) Statement at ¶¶ 39–40. By letter dated June 16, 1986, Customs notified defendants' attorneys that it had "conclud[ed] that protection against the importation of genuine, so-called 'gray market,' goods is not available to your client," because Rolex U.S.A. "is under common ownership or control, either beneficial and/or legal, with a foreign company owning the trademark abroad." Plts. Exh. 10. The letter stated that effective thirty days therefrom, Customs would not continue to protect Rolex U.S.A. against the importation of gray-market goods. Some copies of the letter bore a notation that the effective date may be delayed. Plts. Exh. 11.

In response to defendants' letter of June 25, 1986, Customs agreed to defer the effective date of removal of protection until August 16, 1986 in order to consider defendants' submissions bearing on the issue of its ownership structure. Plts. Exh. 12.

Defendant Rolex U.S.A. did, in fact, submit information to Customs in 1986, including materials pertaining to the ownership of the trademark "ROLEX" in Switzerland and the U.S. and the corporate structure of the various Rolex companies. Defs. Rule 3(g) Statement at ¶¶ 42–43.

On June 7, 1988, plaintiff's attorney wrote to Customs asking them finally to implement their letter of June 16, 1986 and remove gray-market protection for the "ROLEX" trademark. Defs. Exh. D–0014. Customs responded by letter on September 16, 1988; however, the nature of the response was far from clear. Defs. Exh. D–0016.[3] To date, defendants continue to receive protection against the importation of gray-market goods under the Customs Regulations.

## Discussion

### Subject Matter Jurisdiction

As a preliminary matter, we must address defendants' arguments that this Court either lacks subject matter jurisdiction or that it should decline to exercise its jurisdiction under the doctrine of "primary agency jurisdiction."

### *Exclusive Jurisdiction*

■ Defendants characterize plaintiff's RICO action against Rolex as an action to protest Customs' exclusion of the eight watches from entry into the United States. Hence, they argue that Shaw's exclusive remedy lay in administrative action. It is true that Customs' decision to exclude merchandise is final under 19 U.S.C. § 1514(a)(4) unless a protest is filed in accordance with that section.[4] It is also true that the Court of International Trade ("CIT"), formerly the Customs Court, has

---

**2.** The parties, as is discussed below, dispute the scope of the waiver provision contained in the agreement.

**3.** The parties dispute the meaning of the September 1988 letter. Plaintiff interprets it to mean that "the proposed revocation of gray-market protection for Rolex was still being deferred." Plts. Memorandum at 3. Defendants, on the other hand, emphasize the portion of that letter which states that " 'at this time, removal of trademark protection does not appear warrant-

ed.'" Defs. Memorandum at 14–15. Accordingly, plaintiff characterizes Customs as having "deferred the revocation of the recordation," and defendants characterize Customs as having "maintained" the recordation.

**4.** Protests are administrative complaints available to importers challenging certain actions by Customs, including "the exclusion of merchandise from entry or delivery under any provision of the customs laws." 19 U.S.C. § 1514(a)(4).

exclusive jurisdiction over civil actions commenced against the United States and agencies and officers thereof to contest the denial of a protest. *See* 28 U.S.C. § 1581(a).[5] However, the fact that plaintiff would be required to challenge the exclusion of his merchandise through agency channels does not necessarily lead to the conclusion that this Court lacks subject matter jurisdiction over plaintiff's RICO action.

The Customs Act of 1980, which created the CIT, did not create new substantive law, it merely provided for exclusive jurisdiction over certain categories of cases in the CIT. In determining whether the CIT has jurisdiction over a matter "[t]he focus must be solely on whether the claim falls within the language and intent of the jurisdictional grant *to* the CIT." *See Vivitar Corp. v. United States*, 761 F.2d 1552, 1559–60 (Fed.Cir.1985), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986). Plaintiff's RICO action seeking only money damages against Rolex does not fall within the scope of Section 1581(a) and hence does not properly lie within the exclusive jurisdiction of the CIT.[6] Congress's overriding purpose in enacting 28 U.S.C. § 1581 was to establish uniformity and expertise in certain matters of international trade by consolidating jurisdiction over such matters in a single specialized court. *See Olympus Corp. v. United States*, 792 F.2d 315, 318 (2d Cir.1986), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). Those ends would not be served in this RICO action, since it primarily involves applying the standards

for fraudulent misrepresentation—a function within the traditional competence of the district courts.[7]

In sum, this Court rejects defendants' contentions and finds that it has jurisdiction over this matter under the general federal question provision, 28 U.S.C. § 1331, and under RICO, 18 U.S.C. § 1962(c) *et seq.*

### Primary Agency Jurisdiction

■ Defendants also assert that the Court must dismiss Shaw's RICO action under the doctrine of primary jurisdiction. However, defendants' assertion indicates a fundamental misunderstanding of that doctrine. The doctrine is a flexible one and is " 'concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.' " *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303, 96 S.Ct. 1978, 1986, 48 L.Ed.2d 643 (1976) (*quoting United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956)). It is invoked when a court, having unquestioned jurisdiction over a case, determines that "it may be appropriate to refer specific issues to an agency for initial determination where that procedure would secure '[u]niformity and consistency in the regulation of business entrusted to a particular agency' " or where the special expertise of the agency is required for the resolution of technical issues. *Nader*, 426 U.S. at 303–04, 96 S.Ct. at 1986–87. In such an instance, the court will suspend the action pending administrative determination of the issues referred. *Id.* at 63–64, 77 S.Ct. at 164–65. *See also J.*

---

**5.** Section 1581(a) provides:

The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.

**6.** Defendants have not cited, nor has research revealed, any instance in which the CIT has entertained an action against a trademark owner alleging fraud under RICO.

**7.** Defendant, in support of its position that the CIT has exclusive jurisdiction over this RICO action, relies primarily on *Haddad Mfg. Co. v. Gucci, Inc.*, 651 F.Supp. 1277 (D.N.J.1987). That

case, however, is inapposite. It involved a declaratory judgment action by an importer of luggage, which allegedly carried a counterfeit trademark, for an order releasing luggage which was held by Customs. Though the plaintiff named Gucci as a defendant, its actual grievance was with Customs and the relief sought, release of the goods, was that which could be granted by the administrative agency and reviewed by the CIT. Shaw's grievance, by contrast, *is not with Customs. He alleges only that he was injured by the actions of the defendants, in that they knowingly submitted false documents to Customs upon which Customs relied in granting Rolex the U.S. trademark recordation to Rolex in 1983. Am. Cplt. ¶¶ 62–63.

Stein, G. Mitchell & B. Mezines, 5 *Administrative Law* § 47.01[1] (rev. ed. 1991).

Referral of the issues underlying this RICO action cannot be justified by the interest in promoting uniformity and accuracy of decisionmaking within an agency's area of expertise. The standards of fraudulent misrepresentation and omission to be applied in this RICO action are within the conventional competence of this Court. *Cf. Nader*, 426 U.S. 290, at 305–06, 96 S.Ct. 1978, at 1987–88 (1976) (referral of misrepresentation issue to the administrative agency not justified by the interest in informing the court's final decision with the expertise of that agency). Moreover, while Customs may investigate fraud in the application process, Congress has authorized only the courts to award the extraordinary remedy of treble damages and attorney's fees under RICO.

Defendants cite three cases for the proposition that, where a procedure for administrative review is established, a claim based on alleged fraud before a federal administrative agency should first be pursued before that agency. *See Alberta Gas Chemicals, Ltd. v. Celanese Corp.*, 650 F.2d 9 (2d Cir.1981) (action for common law fraud and unfair competition against corporation based upon its presentation of allegedly perjurious testimony before the International Trade Commission); *Meditech Int'l Co. v. Minigrip, Inc.*, 648 F.Supp. 1488 (N.D.Ill.1986) (action alleging violations of the Sherman Act and RICO based upon defendant's alleged unlawful conduct in misleading the International Trade Commission); *Nike, Inc. v. Rubber Mfrs. Ass'n*, 509 F.Supp. 912 (S.D.N.Y.1981) (antitrust action alleging that defendants made false certifications which caused Customs to impose excessive duties on plaintiff).

In suggesting that those cases establish a rule to be applied in all cases where fraud before an administrative agency is alleged, defendants ignore the nature of the doctrine of primary agency jurisdiction, which "call[s] for a decision based on the particular facts of each case." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 69, 77 S.Ct. 161, 168 (1956). In each of the cases cited by defendants, the court deferred jurisdiction until such time as the plaintiff could present its case to the agency in question. In those cases, initial resort to the agency had the potential to result in a determination which would moot or narrow the issues to be considered by the district court. In the instant case, by contrast, it is evident that further resort to Customs would be unavailing. Since 1985, Customs has been aware that Shaw, by his attorney, Mr. Soller, challenges the propriety of the trademark protection granted to Rolex U.S.A. Defs. Rule 3(g) Statement of Undisputed Material Facts at ¶¶ 39–41. By letter dated June 16, 1986, Customs even concluded that the Rolex U.S.A. recordation should be revoked because of evidence suggesting that the U.S. and the Swiss owners of the "ROLEX" trademark were under common ownership and control. Defs. Exh. 10. Since that time, however, and after the submission of additional information by Rolex, Customs has declined to act on its decision with respect to the recordation. In view of Customs' continued inaction, referral of this matter once again to Customs would be unnecessarily expensive and likely to have a preordained outcome, fostering further needless delay.[8] Defendant's Motion for Summary Judgment

Having determined that there is subject matter jurisdiction over plaintiffs' RICO action, the Court will now address defendants' motion for summary judgment.

---

**8.** Defendant similarly argues that the doctrine requiring the exhaustion of administrative remedies applies in this case. That doctrine provides "'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969) (*quoting Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938)). Since the Court has concluded that plaintiff's RICO action is fundamentally different from an action challenging the exclusion of merchandise, over which the agency and the CIT would have exclusive jurisdiction, the Court rejects defendants' exhaustion arguments.

*The Standard for Summary Judgment*

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed. R.Civ.P. 56(c); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight*, 804 F.2d at 11. The inquiry under a motion for summary judgment is thus the same as that under a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

*Reliance*

■ Defendants argue that summary judgment should be granted in this action since there are no disputed facts with respect to the claim of fraud. Defendants submit that in order to succeed on his fraud claim, plaintiff must show reliance by Customs on the information allegedly fraudulently misrepresented or omitted by Rolex. In this respect, defendants contend that all the information allegedly withheld from Customs was submitted to Customs in 1985 and 1986. Consequently, defendants argue that plaintiff cannot show that Customs relied in 1983, since "[t]he disclosure [by Rolex] to Customs in 1986 of the information which the Complaint alleges was fraudulently concealed from Customs did not result in withdrawal of the recordation." Defs. Memorandum at 11.

Plaintiff contends that, contrary to defendants' assertions, Customs has not ruled definitively that defendants' recordation of the U.S. trademark with Customs should not be revoked. Instead, plaintiff submits that the September 16, 1988 letter from Customs to Mr. Soller indicates that Customs continues to defer its decision to revoke Rolex's gray-market protection. Plts. Sur-reply at 3. Hence, they argue, there is a disputed question of fact as to whether Customs reviewed all the allegedly relevant information in 1986 and found, in fact, that Rolex U.S.A. is entitled to the U.S. trademark recordation. In addition, plaintiff argues that "the issue is not so much whether Customs decided to revoke the recordation, but whether defendants would have been awarded gray-market protection if they had originally made the required disclosures." Plts. Memorandum at 5.

The Court concludes that defendants' assertion that Customs had all the allegedly omitted information in 1986 and still declined to revoke the recordation does not meet their burden of demonstrating clearly that no genuine issue of fact exists on the issue of reliance. The 1988 letter from Customs to Mr. Soller does not state unambiguously that Customs has reviewed all the submitted materials with respect to the corporate ownership structure of Rolex and decided that Rolex U.S.A. is entitled to protection against the importation of gray-market goods. While the letter does state that "at this time, removal of trademark protection does not appear warranted," it also indicates that there is a "lingering question of ownership or control of the 'ROLEX' trademark" which is not yet resolved. Moreover, it states that the presentation by Rolex U.S.A. in 1986 "resulted in *deferring* any removal of gray market protection" (emphasis added). Defs. Exh. D–0016.

Plaintiff should be afforded the opportunity at trial to prove that Customs did not conclusively determine the issue of whether Rolex U.S.A. is under common owner-

ship or control with the Swiss owner of the "ROLEX" trademark. Moreover, plaintiff should be permitted to show that any determination by Customs in 1986 is not indicative of how Customs would have decided the issue of ownership or control initially in 1983 had defendants originally submitted the allegedly concealed information. Consequently, defendants' motion for summary judgment on this issue is denied.

*Waiver*

■ Defendants also argue that summary judgment is appropriate in this action, because Shaw signed an agreement with Customs on May 23, 1986 (*see* Defs. Exh. F–33) in which he "released all claims against Customs based on the detention/seizure of the eight watches in exchange for obtaining the watches for export." Defs. Reply Br. at 7. They contend that the instant case is exactly analogous to the situation presented in *Nike, Inc. v. Rubber Mfrs. Ass'n,* 509 F.Supp. 912, 916 (S.D.N.Y.1981). In that case, the District Court concluded that plaintiffs' agreement with Customs prohibited reopening the question of the validity of the duties levied on plaintiff's goods imported before October 2, 1979, including the question of whether the defendants had influenced Customs through false certifications to impose the alleged excessive duties. *Id.* at 916.

While defendants contend that *Nike* is exactly analogous to the case at issue and can support a finding that Shaw has waived his rights to proceed against Rolex in this RICO action, plaintiff contends that its agreement with Customs "did not constitute a waiver of any legal remedies against anyone other than Customs." Plts. Sur-reply at 6. Because the agreement in *Nike* and the one entered into by Shaw appear to contain significantly different

language, the Court declines to hold as a matter of law that *Nike* controls the disposition of this issue. The interpretation of the agreement entered into between Shaw and Customs and its significance is a matter more appropriately left for trial.[9]

**Damages for Emotional Distress Under RICO**

■ In an Opinion and Order dated November 12, 1987, this Court dismissed Shaw's common law claim for intentional infliction of emotional distress. However, Shaw maintains that he is entitled to recover for emotional distress as damages under RICO. Defendants take issue with Shaw's contention and argue that RICO does not permit recovery for emotional distress or physical injury.

To state a claim under RICO, the plaintiff must allege injury to business or property by reason of a RICO violation. 18 U.S.C. § 1964(c). As defendants point out, courts have uniformly held that injuries such as emotional distress or physical injury are not cognizable under RICO. *See, e.g., Fleischhauer v. Feltner,* 879 F.2d 1290, 1300 (6th Cir.1989), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 (1990), *and cert. denied,* —— U.S. ——, 110 S.Ct. 1473, 108 L.Ed.2d 611 (1990); *Drake v. B.F. Goodrich Co.,* 782 F.2d 638, 644 (6th Cir.1986); *Rafferty v. Halprin,* No. 90 Civ. 2751, 1991 WL 148798, at *4 (S.D.N.Y. July 26, 1991); *James v. Lan–O–Tone Prods., Inc.,* No. 88 Civ. 7716, 1989 WL 61852, at *1 (S.D.N.Y. June 7, 1989); *Pohlot v. Pohlot,* 664 F.Supp. 112, 116 (S.D.N.Y.1987).

Shaw has cited no case to the contrary. Instead, he attempts to distinguish defendants' authorities on the grounds that they address only the question of whether emotional distress or physical injury, in the

---

**9.** Defendants additionally assert that this Court should find as a matter of law that defendants' alleged fraud did not proximately cause plaintiff's injury. While several of defendants' arguments in support of that assertion may be appealing, the Court believes that they depend upon the resolution of factual issues, including: whether defendants' recordation with Customs was unlawful; and whether defendants would have been able to maintain and succeed in a

private action against Shaw under § 1526 for unlawful importation of the watches had defendants not been entitled to the protection of the Customs Regulations. The Court has already concluded that there are material issues of fact on the reliance issue which require a trial on the merits; consequently, the parties will have ample opportunity to present their positions on the proximate cause issue at that time.

absence of attendant damage to business or property, establishes a claim under RICO. However, this distinction is not supported by the case law or the statutory language. In *Fleischhauer*, the Sixth Circuit limited a claim for relief under RICO to the amount of damages sustained to plaintiff's business or property—any attendant damages due to physical injury or emotional distress were not recoverable. 879 F.2d at 1300. *See also Cuzzupe v. Paparone Realty Co.*, 596 F.Supp. 988, 991 (D.N.J.1984) (dismissing plaintiffs' attendant claims for emotional distress and personal injury as damages under RICO where plaintiffs had alleged injury to business and property); *Callan v. State Chemical Mfg. Co.*, 584 F.Supp. 619, 623 (E.D.Pa. 1984) (lost income was recoverable under RICO; however, damages for the alleged attendant mental anguish were not).

Shaw refers the Court to the principle that the RICO statute should be construed broadly to serve its remedial purposes. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985). However, reference to RICO's broad remedial purposes cannot alter the unambiguous language of the statute. The requirement that the injury be to the plaintiff's business or property implies that treble damages are only recoverable for injuries of a proprietary nature. Plaintiff's alleged injuries to his emotional or physical well-being do not meet this requirement. Consequently, to the extent that plaintiff's claims for damages under RICO are based on emotional distress or physical injury, those claims are dismissed.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment is denied. However, insofar as the RICO claims seek damages based on emotional distress, those claims are dismissed.

SO ORDERED.